UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WALTER POGLIANI, JACQUELINE DUNN, STEPHEN
DUNN, ROBERT H. BOYLE, DIMITRI SEVASTOLPOULO,
IAN NITSCHKE, and STAND TOGETHER OPPOSE
POWER PLANT ("S.T.O.P.P."),

                              Plaintiffs,

        - against -                                      1:01-CV-0951

UNITED STATES ARMY CORPS OF ENGINEERS,

                              Defendant.

_____

APPEARANCES                              OF COUNSEL

McCALLION & ASSOCIATES, L.L.P.           Kenneth F. McCallion, Esq.
*Attorneys for Plaintiffs*
16 West 46th Street
New York, New York 10036

GLENN T. SUDDABY                         Diane J. Cagino, Esq.
UNITED STATES ATTORNEY                   Assistant U.S. Attorney
Northern District of New York
445 Broadway, Room 231
James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**NORMAN A. MORDUE, Chief Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

        This matter has been the subject of several decisions and the parties' familiarity with

same is assumed. *See, e.g., Pogliani v. U.S. Army Corps of Engineers*, 146 Fed.Appx. 528 (2d

Cir. 2005) ("*Pogliani V*"); *Pogliani v. U.S. Army Corps of Eng'rs,* Civil Case No. 1:01-CV-

0951 (N.D.N.Y. March 31, 2004, Mordue, D.J.) ("*Pogliani IV"); Pogliani v. U.S. Army Corps

of Eng'rs*, *Pogliani v. U.S. Army Corps of Eng'rs*, 49 Fed.Appx. 327 (2d Cir. 2002)

(*"Pogliani III"*); *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235 (2d Cir. 2002) (per

curiam) (*"Pogliani II"*); *Pogliani v. U.S. Army Corps of Eng'rs*, 166 F.Supp.2d 673 (N.D.N.Y.

2001) (*"Pogliani I"*).  Plaintiffs are concerned citizens and property owners who commenced

an action for  declaratory and injunctive relief under the National Environmental Policy Act

("NEPA") and the National Historic Preservation Act ("NHPA").  The action sought to: 1)

enjoin the Army Corps of Engineers from issuing a permit to Athens Generating Company,

L.P., allowing the company to use federal waters and wetlands for construction and operation

of a new gas-fired power plant in Athens, New York; and 2) declare that the Army Corps had

violated various substantive and procedural aspects of NEPA and NHPA in its administrative

proceedings.  This Court denied plaintiffs' motion for preliminary injunction as well as a

motion to intervene by Athens Generating.  The Court of Appeals affirmed denial of the

motion for preliminary injunction but remanded for further consideration of the motion to

intervene by Athens Generating.  On remand, this Court again denied Athens Generating's

motion to intervene which determination was affirmed by the Court of Appeals.  Presently

before the Court is defendant's motion for summary judgment.

## II.    ADMINISTRATIVE HISTORY

Given the extensive nature of the administrative review in this case, the quality and

adequacy of which this Court is required to assess, the Court will again set forth a detailed

summary of the relevant facts:  On September 9, 1997, Athens Generating, an indirect wholly

owned subsidiary of Pacific Gas & Electric Corporation, commenced a state administrative

proceeding by submitting a "pre-application" report, required to obtain a Certificate of

Environmental Compatibility and Public Need (" EC Certificate") for construction of a major

electric generation facility,[1] to the New York State Board on Electric Generation Siting and the Environment ("Siting Board") under Article X of the New York Public Service Law ("Article X").  *See* N.Y. Pub. Serv. Law § 160 *et seq.*[2]  The Siting Board and Athens Generating thereafter received public input concerning the report by way of public hearings, mail, telephone and the internet.  The Siting Board and Athens Generating simultaneously engaged in a formal stipulation process which defined the appropriate "pre-application" environmental studies, which were completed by Athens Generating and its consultants.  On

---

[1]

The site of the proposed power plant was located approximately 2 miles west of the Hudson River in the Town of Athens, Greene County, New York.  The plant would consist of three generation units, each with its own emission stack, a common cooling tower and an administrative building.  Support facilities would include intake and discharge pipelines to be constructed and submerged three miles away in the Hudson River and a modest sized pump house facility on the shore of the River.  Water supply and return discharge pipes would be constructed underground.  The plant would be powered by natural gas via an underground natural gas pipeline linked to the existing Iroquois Gas Pipeline Company system approximately 2000 feet north of the plant site.  The plant would interconnect to the state's power grid at Niagara Mohawk Power Corporation's Leeds Substation, which is located on an adjacent parcel of land approximately 2,000 feet southeast of the proposed facility and use the New York State Bulk Transmission System to provide electric power through the New York Independent Systems Operator ("NYISO").

[2]

N.Y. Pub. Serv. Law Article X *(see,* L. 1992, ch. 519, § 6, as amended by L. 1999, ch. 636) provides for a comprehensive review of environmental and public interest impacts and the issuance of an EC Certificate and public need as a precondition to the siting of a major electric generating facility, i.e., one with an output of 80,000 kilowatts or more, within the state of New York. *See* N.Y. Pub. Serv. Law §§ 160(2); 162.  Ultimate authority for the prescribed review and issuance of an EC Certificate is vested in the Siting Board, within New York's Department of Public Service, which consists of the Chair of the Department of Public Service, the Commissioner of Environmental Conservation, the Commissioner of Health, the Chair of the Energy Research and Development Authority, the Commissioner of Economic Development, and two *ad hoc* public members appointed by the Governor. *See* N.Y. Pub. Serv. Law § 160(4).  The application submitted by Athens Generating was the first to propose a private, fully merchant-owned generating facility since enactment of Article X.

3

August 28, 1998, Athens Generating filed its formal application for an EC Certificate and the Siting Board Chair determined that the application was complete on October 22, 1998.

Administrative Law Judges from the New York State Department of Environmental Conservation ("DEC") and the New York State Department of Public Service ("DPS") were appointed to serve as Hearing Examiners.  The Hearing Examiners conducted a prehearing conference and public statement hearings in November 1998 and following pre-filed testimony on all issues, held evidentiary hearings in March, April and June 1999.  After a round of initial and reply briefs from various parties including some voluntary citizens' groups, the Hearing Examiners issued a 339-page recommended decision on September 3, 1999, suggesting that the Siting Board grant an EC Certificate, subject to a number of specified terms and conditions.

Interested parties filed exceptions to the recommended decision to the Siting Board in addition to further briefs opposing the exceptions, in September and October 1999.  On November 30, 1999, the Siting Board Chair requested supplemental information from Athens Generating concerning the plant's cooling technology, visual impacts, and related issues.  On remand, the Hearing Examiners considered a number of issues, including the facility's proposed configuration if dry cooling technology were to be utilized.  Responsive and rebuttal testimony was filed in December 1999 and January 2000.  Additional hearings were held on January 26 and 27, 2000, and supplemental initial briefs and reply briefs were filed by the parties in February 2000.

The application for Article X certification filed by Athens Generating also included an application to DEC for a State Pollutant Discharge Elimination System (hereinafter "SPDES")

permit for the withdrawal of water from the Hudson River for cooling purposes and the subsequent discharge of the unevaporated remainder.  Based upon the determination by the Commissioner of DEC that water intake should be limited to 0.18 million gallons per day in order to satisfy "best technology available" requirements and avoid adverse impacts on Hudson River fish populations, the SPDES permit issued by DEC on June 12, 2000, effectively required that the plant utilize "dry" cooling technology as opposed to the "wet" or hybrid evaporative cooling system which was originally proposed and which would have required considerably more water.

In a 123-page opinion and order issued June 15, 2000, the Siting Board granted Athens Generating an EC Certificate to construct the plant subject to certain conditions.  As required by Article X, the Siting Board made several findings including: 1) a determination that the plant was selected pursuant to an approved procurement process and would serve the public interest (*see*, N.Y. Pub. Serv. Law §§ 168(2)(a)(ii); (e)); 2) adverse impacts upon the environment would be minimized and the facility would be compatible with public health and safety by virtue of the EC Certificate terms set forth in the Siting Board approval order and the terms of permits issued by other agencies, including the DEC requirement concerning the use of dry cooling technology (*see*, N.Y. Pub. Serv. Law §§ 168 (2)(c)(i), (ii)); 3) the plant's effect on the area's visual resources would be mitigated by lowering the height of the emission stack and using dry cooling to eliminate steam plumes (*see,* N.Y. Pub. Serv. Law § 168(2)(b)); and 4) certain waivers from the Town's zoning ordinances were deemed "unreasonably restrictive" in relation to Article X's goal of promoting development of additional major power sources while at the same time balancing environmental concerns were required (*see*, N.Y. Pub. Serv.

Law § 168(2)(d)).

By petition dated July 14, 2000, Citizens for the Hudson Valley, Inc. (an organization in which plaintiff Sevastopoulo is a founder and a principal), along with other interested parties sought rehearing, which petition was denied by the Siting Board on August 10, 2000. On September 8, 2000, the aforementioned petitioners commenced an action pursuant to Article 78 of New York Civil Practice Law and Rules and Article X seeking nullification of the EC Certificate arguing that the Siting Board's decision to grant it to Athens Generating was arbitrary and capricious and not supported by substantial evidence.  Many of the named plaintiffs in this case as well as witnesses whom submitted evidence in opposition to defendant's motion for summary judgment are members or supporters of Citizens for the Hudson Valley.

Citizens for the Hudson Valley is concerned about the adverse environmental consequences of potential re-industrialization of the Hudson River area which, in their estimation, has just begun to recover from previous decades of environmental abuse.  As a further matter, because the Hudson River and Valley are designated as National Heritage Areas due to their historic and economic significance, plaintiffs as well as Citizens for the Hudson Valley and its supporters believe the state and federal government need to be aware of and sensitive to the impact of industrial construction in the area.  Of particular concern to plaintiffs is the potential degradation of heretofore undisturbed vistas or "viewsheds" from historical homes such as the Olana Mansion and State Historic Site[3] and other archaeological

---

[3]

Olana was the home and studio of nineteenth century painter Frederick Edwin Church who was the "prize" student of Thomas Cole, the founder of the Hudson River School of American landscape painting.  The panoramic views from Church's hilltop estate were the inspiration

landmarks of state and national importance in the vicinity of the proposed power plant.

By order and decision dated April 12, 2001, the New York State Supreme Court, Appellate Division, Third Department unanimously upheld the Siting Board's issuance of the EC Certificate in all respects. *See Citizens for the Hudson Valley v. N.Y. State Bd. on Elec. Generation Siting and the Env't,* 281 A.D.2d 89 (3d Dep't 2001). In its decision, the court rejected the contention by petitioners that the Siting Board erred in its determination that Athens Generating was not required to describe and evaluate alternative sites pursuant to N.Y. Pub. Serv. Law § 164(1)(b). To the contrary, the court concluded that the Siting Board rationally determined that a private applicant, such as Athens Generating, lacking the power of eminent domain, could not be compelled to present alternative sites that it neither owned nor had an option to purchase.[4] This principle notwithstanding, the Siting Board had allowed petitioners in the Article X administrative proceeding to present evidence of alternative sites concerning whether the proposed power plant was in the "public interest." The Third Department determined that the record supported the Siting Board's conclusion that the

---

for some of his most important paintings. Olana, included on the National and State Registries of Historic Places, is located in Greenport, New York, across the Hudson River and less than four miles from the project site.

[4] New York's State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law § 8-0101 *et seq.*, which does require investigation and elimination of alternatives for siting of industrial facilities likely to have a significant impact on the environment is applicable to Article X proceedings by virtue of N.Y. Pub. Serv. Law §164(1)(b). However, DEC regulations passed pursuant to this provision specify that "[s]ite alternatives may be limited to parcels owned by, or under option to, a private project sponsor." 6 N.Y.C.R.R. § 617.9(b)(5)(v); *see also,* 16 N.Y.C.R.R. § 1001.2(d)(2) ("For a private applicant: . . . site alternatives may be limited to parcels owned by, or under option to, such applicant); *Matter of Schodack Concerned Citizens v. Town Bd. of Town of Schodack,* 148 A.D.2d 130, 135 (3d Dep't 1989); *Horn v. Int'l Bus. Mach. Corp.,* 110 A.D.2d 87, 95-96 (2d Dep't 1985).

alternatives offered by petitioners had "problems of their own" and that "[t]here [had] been no showing that there [was] an available, preferable site that should be developed instead of the site proposed by [Athens Generating]." *Citizens for the Hudson Valley,* 723 N.Y.S.2d at 538.

The court also found "substantial evidence in the record to support the Siting Board's conclusion that, considering the environmental impacts, the construction and operation of the [proposed] facility [would be] in the public interest" pursuant to Article X. *Id.* (citing N.Y. Pub. Serv. Law § 168(2)(e)). The court further found:

> Most notably, the record does not support petitioner's contention that construction of the facility will unreasonably impact the viewshed from Olana, the renowned estate of Frederic Church, leader of what was to become known as the Hudson River School of landscape painting. As noted in the Hearing Examiners' decision, "[n]o issue has received more attention in this proceeding than the visual impact of the proposed generating plant," and the Hearing Examiners devoted more than 80 pages of their voluminous decision to that topic, with 26 pages dedicated to visual impacts on Olana alone.
>
> We would first note that the record belies petitioner's representation that the proposed facility is "directly across the Hudson River from Olana." To the contrary, the facility is situated on the opposite side of the river, approximately 3.1 miles north of Olana and two miles inland. The distinction is significant because expert testimony indicated, and the Siting Board found, that the proposed facility would be located in Olana's north/northwest viewshed. Views in that direction "offer a basically flat horizon in the distance, and encompass a section of the Hudson River Valley in the foreground which includes topographic and land use features that are not unusual or extraordinary." The renowned views to the southwest are unaffected.
>
> [Athens Generating] commissioned a visual impact study of the proposed facility which, consistent with the Visual Resources Assessment Procedure issued by the Army Corps of Engineers, was designed to assess the potential visibility of the proposed energy facility and its ancillary structures by comparing the differences in the landscape with and without the above-ground

components of the project in place. Throughout the review, the proposed height of the three combustion turbine emission stacks was reduced from 225 to 213 and, ultimately, to 180 feet. One hundred and eighty-foot stacks not only eliminated the need for obtrusive aviation warning lights, but substantially reduced the degree to which the facility could be seen from distant vistas. In addition, the ultimate decision to utilize dry cooling technology not only minimized impacts on the Hudson River but provided the further benefit of essentially eliminating visible stack plumes, a very significant mitigation measure in light of the focus groups' conclusion that stack plumes represented the most significant visual impact of the facility. Based upon the voluminous record before it, the Siting Board ultimately concluded that "the probable visual impact of the proposed facility would be slight, and that such impact would not be significantly adverse to the interests and areas of concern identified in [Article X]." In our view, that conclusion has abundant support in the record.

*Id.* at 538-39.

Finally, the court found that the administrative record supported the Siting Board's determination that the proposed plant would "contribute to competition, thereby lowering electricity prices, displace less efficient plants, provide a reliable source of electricity at a time when there are projected energy shortfalls and relieve transmission constraints." *Id.* at 539.[5]

---

5

In connection with this determination, the court noted:

Evidence also established that, as a modern natural gas fueled facility, certain noxious gas levels would be reduced and the use of dry cooling technology would result in fewer fish kills because production will be displaced from other Hudson River power plants that draw more water and, therefore, kill more fish. Petitioner's speculation that [Athens Generating] intends to market its electricity in New England lacks support in the record and, at most, raised a credibility issue that the Siting Board was entitled to resolve in favor of [Athens Generating] [citation omitted]. Further, the record indicates that the plant was required as a condition of approval to submit to the [NYISO] for the dispatch of electricity. Thus, even if the plant's electricity were to be sold outside the State, transmission of the electricity through NYISO would commit generators to minimize costs and maintain reliability and the overall amount of electricity produced in the State would be increased, thereby resulting in lower electricity prices.

9

Concurrent with the state Article X proceeding, Athens Generating had also submitted an application to the Army Corps on February 24, 1999, for a permit to undertake certain construction activities in furtherance of building the plant and its support facilities in Army Corps jurisdictional areas.  Specifically, Athens Generating sought a federal permit to: 1) install the water intake and discharge heads and piping in the Hudson River; 2) cross several stream or "wetland" areas and install certain limited portions of the water pipelines in wetland areas; and 3) construct limited portions of the plant - an access road and a portion of one cooling tower - in waters of the United States, including wetlands.  On May 14, 1999, Athens Generating submitted a supplement to its Army Corps application, and on July 20, 1999, the application was deemed complete for processing.

The Army Corps coordinated its review of the proposed project with other federal agencies having jurisdiction and/or significant interest in the subject permit including: 1) the National Marine Fisheries Service ("NMFS") which conducted an Endangered Species Act analysis of the potential impact of the plant's proposed water intake design on short-nosed sturgeon as well as a Fish and Wildlife Coordination Act analysis concerning project modifications necessary to protect other fish and the "diverse macrobenthic community" of the Hudson River; 2) the United States Fish and Wildlife Service ("FWS") which conducted an analysis of the impact of the proposed project on wetland and stream habitats during and after construction of water and gas lines; and 3) the United States Environmental Protection Agency ("EPA") which reviewed potential effects of the project on wetland areas, anticipated effects of discharging wastewater into the Hudson River and the possibility of significant

_____

*Id.* at 539.

erosion following excavation of sediment from the river bottom.  Athens Generating

responded in writing to each of the concerns raised by the above agencies which ultimately

agreed that the permit could be issued upon construction and operation conditions,

modification of the project and/or construction and implementation of protective and/or

restorative measures to ascertain minimal adverse environmental impacts.

On August 4, 1999, the Army Corps issued a public notice describing the proposed

project and requesting public comment.  On September 27, 1999, the Army Corps published a

supplemental public notice which extended the comment period to November 17, 1999, and

announced that a public hearing would be held on November 3, 1999.  On November 3, 1999,

the Army Corps held two sessions of public hearings attended by approximately 400

interested persons.  In response to comments made during the public hearing and additional

written comments which had been submitted by the public, Athens Generating submitted a

two-volume "Response to Comments" to the Army Corps on January 28, 2000.  Between June

and December 2000, the Army Corps made several oral and written requests of Athens

Generating for additional information on various issues of concern to the agency and the

public.

The Army Corps also conducted a review of the potential impacts of the power plant

project on historic properties in conjunction with the New York State Historic Preservation

Office ("SHPO") as well as the Advisory Council on Historic Preservation ("ACHP") which

administers the National Register of Historic Places ("NRHP").  Upon review of the original

proposal submitted by Athens Generating which included hybrid cooling technology for the

plant, SHPO determined that the project would have an adverse effect on the Olana State

11

Historic Site and several other historic resources located in the vicinity of the project which were listed or eligible for listing on the State and National Registers of Historic Places. However, when Athens Generating modified its proposal to use dry cooling technology, thus eliminating or nearly eliminating potential for formation of visible steam plumes, SHPO revised its findings and concluded, in a letter to the Army Corps dated December 28, 2000, that the project revisions, along with the conditions contained in the Article X EC Certificate issued to Athens Generating, "have resolved, to SHPO's satisfaction, the effects that initially caused SHPO to have concerns about the facility."

Nevertheless, the Army Corps subsequently issued a letter to ACHP which determined, pursuant to Section 106 of the NHPA, that the project would have an adverse visual effect on historic properties, including Olana and other historic residences.  As a result of this adverse effect determination, the Army Corps invited ACHP, along with more than twenty other interested parties, including all but two of the plaintiffs herein, to participate in NHPA Section 106 review proceedings concerning the effect of the power plant project on historic properties.  The Army Corps conducted the Section 106 review during late March to mid-May 2001.  During the consulting process, the Army Corps gave interested parties the opportunity to submit written comments on three occasions, attend two meetings and provide oral comments, and review and comment on a draft Memorandum of Agreement ("MOA") between the Army Corps and Athens Generating concerning issuance of the requested permit.

In response to comments submitted by the consulting parties in the course of the Section 106 review, Athens Generating submitted two response documents to address various concerns.  After consideration of final comments from the consulting parties, the Army Corps,

SHPO, ACHP and Athens Generating executed a final MOA on May 16, 2001, which

included agreements and conditions for the permit to avoid, mitigate and/or minimize the

potential adverse effects of the power plant project on historic properties.  Parties to the MOA

also agreed and acknowledged that the Army Corps had thus fulfilled its obligations pursuant

to Section 106 of NHPA and its implementing regulations.

On May 25, 2001, the Army Corps also filed a 107-page document entitled

"Memorandum for Record" ("MFR") which detailed its "statement of findings and

environmental assessment" ("EA") for the permit sought by Athens Generating.  According to

the Army Corps, the MFR was prepared "in accordance with the policies and procedures . . .

for implementation of [NEPA] which requires an agency to prepare an environmental impact

statement ("EIS") when permitting or engaging in a "major Federal action significantly

affecting the quality of the human environment."  42 U.S.C. § 4332 (C).[6]  The MFR sets forth

in great detail the analysis conducted by the Army Corps of the various environmental, health

---

[6] Whether a particular proposed action significantly affects the environment, thus necessitating the preparation of an EIS, is a threshold question.  The Council on Environmental Quality ("CEQ"), created under NEPA, is responsible for promulgating regulations that supplement NEPA's statutory requirements.  The CEQ regulations provide that if the agency is uncertain whether the impacts rise to the level of a major federal action requiring an EIS, the agency must prepare an environmental assessment or EA.  40 C.F.R. §§ 1501.3, 1501.4, 1508.9.  An EA is "a concise document that briefly discusses the relevant  issues and either reaches a conclusion that preparation of [an] EIS is necessary or concludes with a finding of no significant impact, in which case preparation of an EIS is unnecessary."  *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994).  The EA serves to: (1) briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; (2) aid an agency's compliance with the Act when no EIS is necessary; (3) facilitate preparation of a statement when one is necessary;  and "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9.

and safety, historical and aesthetic concerns raised by the public, interested organizations and agencies concerning the power plant project.  In addition, the MFR outlined the Army Corps' efforts to coordinate environmental and historic review of the proposed project with other federal and state agencies having jurisdiction or significant interest in the areas to be affected by the plant.

To wit, the MFR recounted the state review process for the proposed Athens Generating facility which resulted in the Siting Board's issuance of an EC Certificate and DEC's issuance of both SPDES and air pollution control permits.  The MFR also described the original project proposal as well as the substantial modifications made in the course of the state and federal review processes to account for potential environmental and historical impacts identified by interested parties, state and federal agencies, the public, the Siting Board and the Army Corps.

In a fifty-page section of the MFR entitled "Analysis of Public Comments," the Army Corps set forth each and every concern or issue raised during "public coordination" of its review process.  Following each public comment, the Army Corps set forth the response of Athens Generating as well as its own analysis of the issue based on review of the record and its own conclusions.  These public concerns included: 1) the need for the project in the first instance;[7] 2) the need to prepare an EIS in light of the State's failure to have required Athens

---

[7]

The Army Corps concluded that the State Energy Plan for New York, its governor, the Public Service Commission and NYISO unanimously agreed that the additional capacity which could be generated by the proposed facility as well as the facility itself were needed to "maintain the reliability" of New York's electric supply.

Generating to do so;[8] 3) the failure to consider alternative "brownfield" sites already marred by industry or pollution;[9] 4) the use of "hybrid" cooling as opposed to "dry" cooling which represents the best available technology to minimize environmental impact;[10] 5) the potential impact of project construction and operation on "fishery resources" such as shad, striped bass, white perch, alewife and the endangered shortnose sturgeon due to dredging of the river bottom and discharge of heated and treated wastewater back into the river;[11] 6) decreased waterway capacity due to use of Hudson River water to cool the plant; 7) the potential for a decrease in water quality of nearby Sleepy Hollow Lake due to air pollution generated by the

---

[8]

In connection with this issue, the Army Corps concluded that both the state and federal administrative review processes have allowed sufficient opportunity for public involvement and input regarding the potential impacts of the proposed project. Indeed, the Army Corps stated that "the need for an EIS is a primary evaluation factor in [its] regulatory review process."

[9]

While the Army Corps agreed that alternative sites "should be explored to determine if the proposed project represents the least environmentally damaging practicable alternative," the agency reviewed the "no action alternative" of not building the plant at all, alternative siting analysis completed during the Article X proceeding, public comments it received regarding the issue - including five "brownfield" sites discussed by Dr. Robert Henshaw, who represented Citizens for the Hudson Valley, during the Article X administrative hearing - and conducted its own analysis of alternative sites. Because of the proximity of the Athens site to fuel and power transmission infrastructure as well as water supply, the agency concluded that the proposed Athens site was the "only practicable alternative that meets the Project Purpose."

[10]

The Army Corps agreed that dry cooling was the best available technology and that Athens Generating had already modified its proposal to include it.

[11]

In consultation with DEC, NMFS, and the New York Department of State, Division of Coastal Resources ("DOS-DCR"), the Army Corps concluded that the modification of the project to utilize dry cooling, plans to minimize turbidity during construction using port-a-dams and silt curtains and limits on the amount and rate of discharges into the river as well as water temperature would minimize or eliminate any adverse impacts to fish, water quality and quantity.

15

proposed plant, and storm runoff affected by discharge of chemicals into the Hudson River and groundwater near the facility;[12] 8) the loss of wetlands, particularly in the area of Leeds Flats, the cumulative effect of which could result in major impairment of overall wetland resources;[13] 9) the possibility that blasting and other construction activities might open bedrock fissures, impact groundwater resources and affect the "constructural integrity" of existing nearby structures such as the dam that maintains Sleepy Hollow Lake;[14] 10) the likelihood of significant adverse impact to historic properties and archeological resources

---

[12]

The Army Corps concluded after review of DEC's position on this issue that modification of the project as well as stormwater management plans, controls and conditions of the SPDES and Army Corps permits would significantly reduce or eliminate water or air contamination at Sleepy Hollow Lake.  In addition, to further minimize the risk of adverse impact, Athens Generating had agreed to pay the Town of Sleepy Hollow to develop and implement a water quality monitoring program and to enhance the quality of the lake.

[13]

Athens Generating had proposed siting, design and appropriate construction methods to "avoid dredging and filling impacts, and to minimize the extent and significance of unavoidable impacts."  The Army Corps noted that to install the proposed electric transmission line, only 0.01 acre of wetlands would be permanently impacted by construction of tower footings.  Athens Generating also agreed to create 1.6 acres of new wetlands and enhance and restore 3.4 acres of degraded wetlands in Leeds Flats.  The Army Corps concluded that these measures would ensure there was no net loss of wetlands.  The agency also stated it would attach special conditions to any permit it issued to ensure that: 1) proposed temporary impacts to wetlands during construction of the access road and transmission structures were restored; 2) the impacts associated with the project were limited to authorized areas; 3) final mitigation are developed and approved in a timely manner; and 4) work areas and wetland mitigation areas are monitored for successful recovery.

[14]

The Army Corps examined the data submitted by Athens Generating along with technical reports and testimony prepared regarding this issue and determined that impacts associated with any blasting activities would be minimal and, in any event, limited to or very near the project site.  As a further matter, the Army Corps stated that an appropriate plan would be developed "to monitor groundwater and consider corrective measures should any excessive groundwater level fluctuations be observed."

16

located within a five-mile radius of the project site;[15] 11) concerns that the project would not

have a positive economic effect on the area and that the potential for adverse historical and

aesthetic impacts would reduce tourism in Columbia and Greene counties;[16] 12) allegations

that the project, regardless of the modification to dry cooling, would not comply with coastal

management policies established by DOS-DCR and would be inconsistent with the proposed

Local Waterfront Revitalization Program being developed by the Village of Athens;[17] 13)

concern that the Town of Athens had insufficient emergency equipment and personnel to

handle an explosion or other crisis at the plant and that plant operation would be largely

---

[15]

The Army Corps addressed and accounted for these concerns by reviewing the results of the extensive visual impact analysis prepared by Athens Generating in conjunction with SHPO, DPS and other interested parties as well as conducting a full-fledged Section 106 review pursuant to NHPA as referenced above.  The agency thereafter noted that Athens Generating had agreed to modify its proposal to include dry cooling and adopt design measures such as lighting, landscaping, tree protection and facility color, to minimize visual impacts.  Thus, the Army Corps concluded that although the project would have some adverse effects on cultural resources, the impacts would be slight.

[16]

The Army Corps agreed with the evidence submitted by Athens Generating that the project would provide economic benefits through job creation, tax revenues, use of local businesses by employees and the commitment of the company to provide energy locally at wholesale prices.  Furthermore, because the Army Corps determined via its visual impact analysis and the Section 106 review process that negative aesthetic impact of the project would not be significant, it concluded that impacts to tourism and property values would be minimal.  Furthermore, Athens Generating agreed to fund landscaping to screen views of the facility from affected properties and provide funds to enhance properties in the Town and Village of Athens in accordance with its draft Local Waterfront Revitalization Program.

[17]

The Army Corps noted that since DOS-DCR, the agency responsible for administering the federally authorized Coastal Management Program ("CMP"), determined that modification to dry cooling technology rendered the project "consistent" with the state's coastal management efforts, this concern was adequately addressed.

17

unsupervised thus raising safety questions;[18] 14) criticism of the use by Athens Generating of meteorological data from the Albany airport, located 35 miles north of the proposed plant site, in its air dispersion modeling which rendered its air quality analysis inaccurate;[19] 15) criticism of the use of  "typical projections" when assessing the likelihood of unsightly steam plumes emerging from cooling towers and stacks at the plant rather than "worst-cases scenarios;"[20] 16) given the location of the proposed facility near the Hudson River which has already been contaminated by decades of pollution, chemicals, nitrogen oxides, ammonia, carbon dioxide and numerous volatile organic compounds produced and discharged into the water and air via operation of the plant would pose unacceptable health risks, particularly for children attending the nearby school;[21] 17) concern that emissions from cooling towers, including aerosols, will

---

[18]

The Army Corps noted that Athens Generating had consulted with appropriate local officials in the Town of Athens who determined the Town could adequately respond to any emergency situation at the facility with additional training which Athens Generating had agreed and was required to provide as a condition of the Article X EC Certificate.  With respect to the latter issue, the Army Corps stated that each state and federal agency, including the Army Corps, has authority to determine compliance with permits, statutes and regulations as well as authority to enforce non-compliant activities should they occur.

[19]

The Army Corps noted that DEC, the agency responsible for determining the proposed project's compliance with federal and state air quality standards, determined that use of meteorological data from the Albany airport was adequate to assess air quality in accordance with EPA guidelines.

[20]

The Army Corps concluded that based on the use of dry cooling technology, stack plumes were not an expected occurrence at the plant.  Furthermore, to the extent that such plumes developed, Athens Generating was required to create a monitoring program and employ corrective measures to eliminate any visible plumes should they occur.

[21]

The Army Corps reviewed the evidence submitted by Athens Generating on this subject, the available technical information, the findings of the state authorities responsible for authorizing the proposed emissions, including air and water pollution control permits issued by DEC, and determined that the health and safety concerns for residents in or near the

increase local fogging and icing of nearby roads;[22] 18) the suggestion that pooling of contaminated water processed at the facility would create a breeding ground for Legionalla, the pathogen for Legionnaires Disease;[23] and finally 19) increased noise and traffic in the community surrounding the proposed facility during its construction and eventual operation.[24]

    In conclusion, the MFR announced that in the estimation of the Army Corps, issuing the requested permit to Athens Generating would "not significantly affect the quality of the human environment either in an adverse or beneficial manner."  The Army Corps concluded that "issuance of a permit for the proposed work would not be a major federal action significantly affecting the quality of the human environment."  Based thereupon, the Army

_____

project site had been adequately addressed.

[22]

Given the modification to dry cooling technology and use of less water, the Army Corps concluded emissions would be reduced which would, in turn, reduce the potential for increased fogging and icing.  Because appropriate meteorological data was used by Athens Generating in preparing its Seasonal and Annual Cooling Tower Impacts model, the Army Corps determined that any increased impacts to safety regarding the emissions issue was not significant.

[23]

After noting that the state and federal authorities responsible for determining health risks and compliance with air quality standards had concluded that an increased potential for exposure to Legionalla was not significant, the Army Corps did likewise, although Athens Generating agreed to follow applicable guidelines to further minimize any such risk.

[24]

The Army Corps noted that the Article X EC Certificate issued by the Siting Board was conditioned on ensuring that the existing roadway system in and near the Town of Athens was sufficient for expected increases in traffic and that any unavoidable traffic impacts would be minimized.  As a further matter, the Army Corps stated that all of the information submitted concerning the issue of noise pollution demonstrated that impacts associated with noise would be minimal.  Nevertheless the Army Corps resolved to condition and monitor any permit on requiring Athens Generating to develop and operate the facility in furtherance of minimizing noise impacts.

Corps issued a "Finding of No Significant Impact" ("FONSI"),[25] *see* MFR p. 106, GA 0112, and deemed preparation of an EIS unnecessary in accordance with 33 C.F.R. § 230.7(a) which states "[m]ost permits will normally require only an [EA.]" On May 25, 2001, following execution of the MOA and on the same day it filed the MFR, the Army Corps issued a permit to Athens Generating which allowed the company to commence construction work on the power plant project. The subject power plant was thereafter constructed and has been operational since 2004.

## III.    DISCUSSION

A.    Applicable Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant

---

[25]

CEQ regulations provide that a "finding of no significant impact" means a document filed by a federal agency which briefly presents the reasons why an action "will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared" and includes the EA or a summary of it as well as any other related environmental documents. 40 C.F.R. § 1508.13.

meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion.  *Western World Ins. Co. v. Stack Oil*, 922 F.2d 118, 121 (2d Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that nonmoving party must do more than merely show "some metaphysical doubt" as to material facts to escape summary judgment).  It is with these considerations in mind that the Court addresses defendant's motion for summary judgment.

B.     NEPA

At issue herein is NEPA, 42 U.S.C. §§ 4321 *et seq*., and its implementing regulations which the Army Corps was required to follow in its review of the generating project which is the subject of plaintiffs' complaint.  Congress enacted NEPA to ensure federal agencies which issue permits for construction of projects such as the Athens Generating plant examine and disclose the potential environmental impacts of those projects before allowing them to proceed.  *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983); *Kleppe v. Sierra Club*, 427 U.S. 390, 417 (2001) ( "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").  The Act provides that "all agencies of the Federal Government" shall, upon proposing a "major federal action" that will "significantly affect the quality of the human environment," prepare a detailed EIS. 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.  If a federal agency does not know whether a project will result in significant environmental impact or believes that a project will cause no significant impact, it

must prepare an EA, which examines the environmental aspects of the project in less detailed fashion than an EIS. *See* 40 C.F.R. § 1501.4(b); 33 C.F.R Pt. 325, App. B ¶ 7. The reviewing agency must involve the public in the NEPA review process and consider the views of other interested federal, state, and local entities in making its decision of the environmental impact, if any, of any particular project. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1506.6.

1.     Scope of Review under NEPA

         Whether a particular agency action will have a "significant" effect on the environment is a substantive question left to the informed discretion of the agency proposing the action. *Nat. Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir. 1983); *Sierra Club v. U.S. Army Corps of Eng'rs ( Sierra Club I)*, 701 F.2d 1011, 1029 (2d Cir. 1983); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374, 377-78 (1989) (applying arbitrary and capricious standard to agency's decision whether to prepare a supplemental impact statement, which the Court stated was similar to the decision whether to prepare an impact statement in the first instance)). However, because NEPA provides a procedural framework within which such judgments must be made, courts are responsible for ensuring that agencies comply with the statutory duty imposed on them by Congress. *Gorsuch*, 718 F.2d at 35. A reviewing court's inquiry must be "searching and careful," although the ultimate scope of judicial review is narrow. *Marsh,* 490 U.S. at 378. The judiciary must not inject itself into an area where the choice of action to be taken is one confided by Congress to the executive branch. *See Kleppe*, 427 U.S. 390, 410 n. 21.

2.     The Record Rule

         At the outset, this Court must determine the scope of the evidence upon which the

22

merits of defendant's summary judgment motion will be resolved.  Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").  Supplementation of that record may be necessary when the record does not support the agency action, when the agency has not considered all relevant factors, or when the reviewing court simply cannot evaluate the challenged action on the basis of the record before it.  *See Florida Power*, 470 U.S. at 744.

In opposing defendant's motion for summary judgment, plaintiffs rely principally on evidence previously submitted in support of their motion for a preliminary injunction.  The Court examined this evidence in the context of determining whether plaintiffs had made a showing that irreparable harm would result from construction of the power plant during pendency of this litigation.  Defendant contends that all extra-record evidence submitted by plaintiffs should be excluded from consideration on the present motion.

Despite the general "record rule," an extra-record investigation by a reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of an agency or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977).  Deviation from the "record rule" occurs more commonly in the context of NEPA because the statute imposes a

23

duty on federal agencies to compile a comprehensive analysis of the potential environmental

impacts of its proposed action.  *Hoffman*, 132 F.3d at 14-15.  Indeed, the Second Circuit has

framed the issue as follows:

> Review of whether the agency's analysis has satisfied this duty
> often requires a court to look at evidence outside the administrative
> record. To limit the judicial inquiry regarding the completeness of
> the agency record to that record would, in some circumstances,
> make judicial review meaningless and eviscerate the very purposes
> of NEPA. The omission of technical scientific information is often
> not obvious from the record itself, and a court may therefore need
> a plaintiff's aid in calling such omissions to its attention. Thus, we
> have held that the consideration of extra-record evidence may be
> appropriate in the NEPA context to enable a reviewing court to
> determine that the information available to the decisionmaker
> included a complete discussion of environmental effects and
> alternatives.

*Id.* (citations omitted).  Nevertheless, "deviation from the record rule, even in the review of

NEPA decisions, is limited" and courts may conduct plenary review only when the

administrative record is "so inadequate as to prevent the reviewing court from effectively

determining whether the agency considered all environmental consequences of its proposed

action."  *Id.* (citing *Sierra Club v. U.S. Army Corps of Eng'rs,* 772 F.2d 1043, 1051-52 (2d.

Cir. 1985) (*Sierra Club II*).

In the present case, plaintiffs do not acknowledge the existence or application of the

record rule nor do they address defendant's argument that the extra-record evidence should be

rejected.  Unlike the litigants in *Hoffman,* plaintiffs do not argue specifically that the record in

this case contains gaps, is inadequate or that defendant acted in bad faith so as to require

submission of evidence outside the administrative record.  Indeed, counsel for plaintiffs simply

states in his affidavit that the evidence previously submitted in support of the preliminary

24

injunction motion raises "substantial factual questions" to defeat defendant's summary judgment motion.  Thereby, plaintiffs seek to "incorporate by reference" the extra-record affidavits and declarations previously submitted.  There is no evidence in the present case which demonstrates that the defendant agency's administrative record is deficient.  In the absence of even an allegation or argument that the record herein is inadequate or that defendant acted in bad faith,[26] the Court finds no basis to conduct plenary review of matters outside the administrative record.

C.    Plaintiffs' Procedural NEPA Claims

1.    Classification of Army Corps Permit as "Major Federal Action"

Plaintiffs argue in the first instance that the Army Corps erred by failing to categorize the proposed Athens power plant as a "major federal action" in its EA herein.  In contrast, defendant notes that it did characterize the issuance of a permit to Athens Generating for the proposed work in federal waters as a "major federal action."[27]  However, the Army Corps found that the proposed permitting was **not** a "major federal action significantly affecting the quality of the human environment."  *See* MFR p. 106, Government Appendix ("GA") 0112.  The parties thus being in agreement that the Army Corps' issuance of a permit to Athens Generating in this instance was a "major federal action," the Court need not consider this issue further.

---

[26]

The Court notes that even upon perusal of plaintiffs' opposition papers for arguments that are suggested or implied,  plaintiffs' use of words such as "improper" and "disingenuous" to describe defendant's actions herein do not make the required "strong showing" of bad faith necessary to overcome the record rule.  *See Overton Park*, 401 U.S. at 420.

[27]

Federal regulations define "major federal actions" to include "actions with effects that may be major and which are subject to Federal control and responsibility."  40 C.F.R. § 1508.18.

2.      FONSI

In the MFR, the Army Corps determined that while granting the requested permit was a "major federal action" under NEPA regulations, the "intensity" or "severity of impact" of the power plant project was not significant enough to require preparation of an EIS. *See* MFR, p. 105, GA 0111 (citing 40 C.F.R. § 1508.27(b)). Plaintiffs argue that the Army Corps reviewed the federal permit requested by Athens Generating in a vacuum and did not take the required "hard look" at the project as a whole prior to issuance of the FONSI. Furthermore, plaintiffs contend that the Army Corps violated NEPA's procedural requirements by allowing Athens Generating to commence "pre-construction activities" at the proposed site before it entered into the MOA with Athens Generating, SHPO and ACHP on May 14, 2001. Plaintiffs argue that the Army Corps then used the mitigation measures set forth in the May 14, 2001, MOA as a pretext for its FONSI in the MFR on May 25, 2001. The Court addresses these arguments *seriatim*.

a.      Scope of Army Corps' Review

If an agency is uncertain whether the impacts rise to the level of a major federal action requiring an EIS, CEQ regulations require that the agency must prepare an EA. *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9; *see also Hoffman*, 132 F.3d at 12. An EA is "a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of [an] EIS is necessary or concludes with a FONSI, in which case preparation of an EIS is unnecessary." *Espy*, 38 F.3d at 796; *see also* 40 C.F.R. § 1508.9. "When the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared." *Hoffman*, 132 F.3d at 13. "The fact that effects are only a possibility does not insulate the proposed action from consideration under NEPA, but it does accord an

26

agency some latitude in determining whether the risk is sufficient to require preparation of an EIS." *Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 399 F. Supp.2d 386, 398 (S.D.N.Y. 2005) (citing *Gorsuch,* 718 F.2d at 34). An EIS is evidence that an agency has considered the reasonably foreseeable environmental effects of a proposed major action before making a decision to take the action. *See Gorsuch,* 718 F.2d at 34. However, no EIS is required where the major federal action is not "significant" within the meaning of NEPA. *See id.* (citing *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir. 1972), *cert. denied,* 412 U.S. 908 (1973) (*"Hanly II"*); *Hanly v. Mitchell*, 460 F.2d 640, 644 (2d Cir.), *cert. denied*, 409 U.S. 990 (1972) (*"Hanly I"*).

In the present case, the Army Corps determined the following concerning the scope of the project:

> The proposed project consists of the construction and operation of an electric generating facility. Fill discharges and structures in waters of the United States would be required to construct an access road, the energy generation facility, and the installation of water intake and discharge structures and would result in permanent loss of 0.95 acres of waters of the United States, and temporary impacts to 4.14 acres of these waters. Compensatory mitigation and restoration practices, with requirements outlined in Paragraph 11 above, will ensure that no net loss of wetlands occurs. In addition, Paragraph 12 outlines the Corps of Engineers execution and adoption of an MOA on cultural resources that further ensures that the project's setting is not significantly altered. The Corps of Engineers has determined that in the context of its location, the existing conditions at the site, the level of impacts and the measures to minimize those impacts, the proposed work would not constitute a significant deviation from its present conditions.

> A portion of the proposed work would take place in an estuarine portion of the Hudson River well known for its value to fishery resources. However, for the reasons discussed in Paragraphs 10 and 11, which includes the Corps of Engineers decision to adopt the conservation recommendations made by NMFS, the Corps of Engineers has determined that the proposed project would not

significantly affect the aquatic habitat of the relevant fishery resources.

MFR p. 105, GA 0111.

Insofar as evaluating the impact of the project on the environment, the Army Corps identified the following test set forth in 40 C.F.R. § 1508.27(b):

Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing

28

in the [NRHP] or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*See* 40 C.F.R. § 1508.27(b), MFR p. 105-06, GA 0111-12.

The MFR contains 52 pages of analysis by the Army Corps of wide and varied concerns over the Athens Generating project raised by the public.  The next 17 pages of the MFR are devoted to analysis of environmental concerns such as impacts to endangered marine species, protected wetlands and river water quality raised by federal reviewing agencies, specifically NMFS, FWS and EPA.  Paragraph 12 of the MFR includes 12 pages of discussion concerning potential impacts to cultural resources including the Olana Historic Site, other historic properties, and archaeological resources.  Finally, the MFR addresses: 1) expected navigational impacts of constructing intake and discharge pipelines and their support structures within the Hudson River; 2) the fact that Athens Generating was required to obtain a Water Quality Certification from the Siting Board due to the proposed placement of fill in the Hudson River and to comply with the policies of New York's CMP as established by DOS-DCR; 3) the project's compliance with the federal Clean Water and Clean Air Acts; and 4) the project's individual and cumulative effects upon the public interest including the private and public need for the project and alternative site proposals.

Thus, in stark contrast to plaintiffs' argument, the MFR is not limited solely to analysis of the impacts to federal waters, federal permitting and oversight of the Athens Generating

29

project.  The MFR belies plaintiffs' contention that the Army Corps "simply adopted" the view of Athens Generating that the scope of the Army Corps' review of their proposal should be limited to the proposed activities in waters of the United States rather than the impacts of the overall project.  Rather, the MFR painstakingly sets forth the scope of the entire proposed project as well as the substantial modifications made in the course of the state and federal review processes to account for a wide array of potential environmental and historical impacts identified by interested parties, state and federal agencies, the public, the Siting Board and the Army Corps.

b.      Timing Requirements for Conducting Environmental Review

Plaintiffs assert that the Army Corps violated NEPA procedural requirement that an agency consider environmental impacts during its initial decision-making process when it allegedly authorized Athens Generating to commence pre-construction activities at the power plant site on May 1, 2001.  The "smoking gun" identified by plaintiffs in connection with this argument is a May 1, 2001, letter from the Army Corps to Athens Generating sent prior to issuance of the requested permit.

In the letter,  the Army Corps states expressly it was responding to a request by Athens Generating for "confirmation . . . that certain activities proposed to be undertaken by [Athens Generating] would not be subject to the jurisdiction of the Army Corps."  Specifically, Athens Generating had proposed to undertake installation of silt fencing and other protective fencing on portions of the site of the proposed project.  "The stated purpose of the fencing would be to insure that inadvertent disturbances of protected areas, such as wetlands, trees and archaeological resources would not occur, in the event that construction of the [Athens Generating] project was later begun as a result of the issuance of an [Army Corps] permit."

30

Based on the information submitted by Athens Generating concerning the proposed means of installing said fencing, the Army Corps concluded that the work would "not be subject to [Army Corps] jurisdiction and will not require Department of the Army authorization."  The Army Corps then reminded Athens Generating that its determination "**[did] not**" grant the power company authorization to undertake any of the proposed work currently under review by the agency, and that Athens Generating would be proceeding at its own risk should federal lands, waters or "sensitive resources" be impacted by its proposed work or should the Army Corps decline to issue a permit for the power plant project.  Plaintiffs dismiss the afore-referenced statement as mere "conditional language" in an otherwise intact pre-construction authorization.

The Court disagrees.  No reasonable fact finder could conclude that when the Army Corps explicitly informed Athens Generating that it had no jurisdiction to authorize the pre-permit work proposed by Athens Generating and that the power company was proceeding at its own risk in undertaking such activities at the site that the agency was giving Athens Generating a green flag to commence pre-construction of the proposed facility.  Contrary to plaintiffs' contention, *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718-19 (9th Cir. 1988), has no application here.  In *Save the Yaak*, the United States Forest Service awarded contracts for reconstruction of a portion of the Yaak River Road in Montana two years prior to obtaining an EA of the project.  The Forest Service also failed to complete a biological assessment or EIS prior to reconstruction of any of the five sections of road at issue.  Based thereupon, the court concluded that "the agency did not comply with NEPA's requirements concerning the timing of their environmental analysis, thereby seriously impeding the degree to which their planning and decisions could reflect environmental values."  *See id.*, 840 F.2d at 718-19.

31

In this case, the Army Corps was in the final stages of its environmental review of the permit application when Athens Generating requested permission to undertake pre-construction activities outside the jurisdiction of the Army Corps at the proposed power plant site. The letter from the Army Corps in response to this request states expressly that no permit had yet been issued for the work under NEPA review. Moreover, the letter advised Athens Generating that the Army Corps could potentially deny the requested permit. Consequently, the Court finds no basis for plaintiff's claim that the Army Corps committed a procedural violation of NEPA by confirming it had no jurisdiction either to authorize or prohibit Athens Generating from commencing pre-permit work on non-federal lands.

3.      Pre-Judgment of the FONSI

Plaintiffs contend that the Army Corps "authorized" Athens Generating to commence pre-construction work on May 1, 2001, executed an MOA with Athens Generating and others on May 14, 2001, and then utilized the mitigation measures of the MOA as a "pretext" for its determination in the EA issued May 25, 2001, that the environmental impacts of the project were not significant enough to require preparation of an EIS. According to plaintiffs, this sequence of events, which occurred in less than one month, is strong evidence that the Army Corps pre-judged the FONSI issued in connection with the Athens Generating permit.

The Court need only glance at the administrative record in this case to conclude easily that the Army Corps' involvement in and review of the Athens Generating project spanned years, not weeks as alleged by plaintiffs. The Army Corps was involved in pre-application coordination of the proposal by Athens Generating to build the subject power plant long before the company even submitted its federal permit application in April 1999. *See* MFR pp. 2-3, GA 0008-09. Indeed, it was early, pre-application "discussions" between Athens Generating

32

and the Army Corps which prompted the company to change its original proposal for cooling the plant from wet-cooling, which would have required withdrawing many millions of gallons of water per day from the Hudson River, to hybrid cooling technology which involved significantly less use of river water. *See* MFR p. 5, GA 0011. The MFR noted the extensive state review of the proposed Athens power plant conducted by the Siting Board between March and September 1999, including 18 days of public hearings which produced 6,000 pages of hearing transcripts and exhibits. The Army Corps also noted that DEC, which retained jurisdiction over issuing permits required for the project under the federal Clean Air and Water Acts, had also extensively reviewed the proposal. To wit, it was DEC which determined that dry cooling, rather than the hybrid cooling proposed by Athens Generating, was the best available technology to minimize adverse environmental impacts associated with water quality, fish mortality and visibility of stack plumes at the proposed project site. *See* MFR, pp. 4-5, GA 0010-11. Based thereupon DEC issued the SPDES permit required under the Clean Water Act to Athens Generating in June 2000, authorizing the use of dry cooling. *See id.*

Formal NEPA review by the Army Corps had begun meanwhile in April 1999, when Athens Generating submitted its original application for a federal permit to construct intake/discharge pipelines and structures in the Hudson River. As referenced above, the Army Corps coordinated its environmental review of the project with other federal agencies having oversight including NMFS. FWS and EPA. Insofar as identifying impacts to cultural resources, the Army Corps conducted its review in conjunction with SHPO and ACHP. These agencies expressed concern over the potential negative impacts - specifically, the potential for visible steam plumes - to the Olana State Historic Site and other historic resources in the vicinity of the project as originally proposed by Athens Generating. However, SHPO revised

its findings when Athens Generating modified the proposal to use dry cooling technology.

In addition to reviewing the permit application under NEPA, the Army Corps invited ACHP and twenty other interested parties to participate in review of the Athens Generating proposal pursuant to NHPA to determine effect of the power plant project on historic properties.  The three-month review under Section 106 of NHPA resulted in a MOA with 10 pages of conditions which the parties agreed would be "special conditions" on the permit to Athens Generating if the Army Corps elected to grant the company's application for one.  Plaintiffs allege that the MOA "betrayed" the Army Corps' pre-judgment of the question of whether an EIS was necessary under NEPA.  The Court finds no more support in the record for this assertion than the previous one raised by plaintiffs concerning improper timing or sequence of events.

Plaintiffs cite *Metcalf v. Daley*, 214 F.3d 1135, 1144 (9th Cir. 2000), for the proposition that the Army Corps impermissibly committed to the Athens Generating project before conducting the required environmental review under NEPA by 1) authorizing pre-construction work at the site, which the Court has already determined did not happen in this case; and 2) entering an MOA with special conditions which were later included in the EA in support of the FONSI.  No reasonable measure of the evidence in this case could result in a conclusion that the Army Corps used the mitigation measures outlined in the MOA as a pretext for its determination that no EIS was necessary.

The MOA was an agreement between the Army Corps, Athens Generating and other interested agencies and parties concerning the nature and scope of mitigation measures which would be necessary to minimize or negate adverse impacts to historical and cultural resources in and around the project site in the event the requested permit was granted.  Review of the

34

administrative record reveals that no issue received more time and attention by state and
federal agencies or citizen opponents than the visual impact of the proposed power plant on
the renowned scenery of the historic Hudson River.  Although the Army Corps conducted a
specific analysis of the potential impacts to historic properties under Section 106 of NHPA,
the resulting MOA ultimately addressed a common concern under NEPA, that is, the potential
negative impact of the project on the quality of the human environment, including both
cultural and ecological resources.  The MOA was executed as nearly the last step in a more
than two-year process of government and public evaluation of the costs, benefits, need for and
potential environmental impacts of the proposed power plant project under both the NHPA
and NEPA.

Thus, the present facts stand in stark contrast to *Metcalf* where the federal agencies
considering an Indian tribe's proposal to resume whaling entered into a written contract to
support the tribe's whaling proposal long before even **commencing** NEPA review.  *See id.*,
214 F.3d at 1144 ("The 'point of commitment' . . . came when [the agency] signed the contract
with [the tribe] and then worked to effectuate the agreement.  It was at this juncture that it
made an 'irreversible and irretrievable commitment of resources. . . . These events
demonstrate that the agency did not comply with NEPA's requirements concerning the timing
of their environmental analysis") (citing *Save the Yaak*, 840 F.2d at 718-19)).  The court found
that the agency in *Metcalf* was "slanted" in favor of finding that the tribe's whaling proposal
would not significantly affect the environment based on its execution of an agreement with the
tribe in 1996 to seek a hunting quota on the tribe's behalf from the International Whaling
Commission.  The agency executed a similar agreement with the tribe in 1997 and then four
days later issued an EA and FONSI.  Based upon the sequence of events, the court found that

EA was "disingenuous" when it claimed the "decision to be made" was "whether to support the Makah Tribe in its effort to continue its whaling tradition" when the agency had already contractually bound itself to support the whaling proposal.

In the case at bar, no such pretense exists.  The Court finds no foundation for plaintiffs' assertion that the Army Corps used the mitigation measures outlined in the MOA as a cover for its determination that no EIS was necessary.  Far from demonstrating that the Army Corps pre-judged its ultimate conclusion under NEPA to issue a FONSI, the MOA evidenced the culmination of years of effort by the Army Corps to ensure each and every potential concern raised by relevant state authorities and the concerned public over the most controversial aspect of the proposed project was resolved.

4.      Reliance on Mitigation Measures

Citing *Hoffman*, plaintiffs contend that in addition to demonstrating pretext, the mitigation measures of the MOA which were ultimately adopted as part of the EA were not supported by substantial evidence.  To wit, plaintiffs assert that the Army Corps improperly "assumed" that the mitigation measures outlined in the EA would reduce the significance of the project's adverse environmental impacts below the threshold required for an EIS without conducting tests, studies or analyses to demonstrate the efficacy of those mitigation measures.

The law is well-settled that "[w]hen the adequacy of proposed mitigation measures is supported by substantial evidence, [an] agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS. *Hoffmann,* 132 F.3d at 17 (citing *Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1556-57 (2d Cir. 1992); *Abenaki Nation of Mississquoi v. Hughes*, 805 F.Supp. 234, 245 (D.Vt.1992), *aff'd*, 990 F.2d 729 (2d Cir. 1993)).  "In practice, mitigation measures have been

found to be sufficiently supported when based on studies conducted by the agency, *see Ompompanoosuc*, 968 F.2d at 1555 (study of proposed mitigation conducted by agency along with consultation with another agency), or when they are likely to be adequately policed, *see Abenaki*, 805 F.Supp. at 239 n. 9." *Id.* In *Abenaki*, the efficacy of the mitigation measures were assured because they were included as mandatory conditions in the issued permits. These conditions required implementation of a detailed plan to monitor the effects of the proposed action and the mitigation of those effects in the event wetlands were lost as a result. Further, the plan required monitoring of the mitigation efforts, if any were made, to ensure that they were effective and required implementation of an alternative mitigation plan, spelled out in detail, if they were not. *Id.*

It is apparent from review of the permit issued by the Army Corps that it was conditioned upon continued monitoring of all environmental impacts identified in the EA which were to be eliminated or minimized by various mitigation measures. Specifically, the permit was issued subject to the conditions and stipulations of *inter alia*: 1) the use of dry cooling technology; 2) the Water Quality Certificate issued by the Siting Board; 3) the water intake limitations established in the SPDES permit issued by DEC; 4) an "ichthypoplankton entrainment monitoring program" in conjunction with NMFS in the event fish mortality rates significantly exceeded those predicted in the permit application; 5) the preparation of annual reports to the Corps of Engineers for five years after completion of installation of the water pipelines on the status of the restoration of wetlands and the river bottom; and 6) the many requirements of the MOA concerning treatment of cultural and historic resources.[28] The Army

---

[28] The MOA required Athens Generating, upon issuance of the requested permit, to submit to

37

Corps' reliance on mitigation measures in issuing a FONSI here was thus entirely consistent with the Second Circuit's holding in *Hoffman* wherein the court found that had the mitigation measure at issue "included a program to monitor and ensure its effectiveness, there would then have been substantial evidence to support it."  *See* 132 F.3d at 17.

> NEPA's EIS requirement is governed by the rule of reason, and an EIS must be prepared only when significant environmental impacts will occur as a result of the proposed action. If, however the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required. To require an EIS in such circumstances would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.

*Abenaki*, 805 F.Supp 234 (citation and internal quotation marks omitted).  This Court finds no material factual questions concerning whether the Army Corps' reliance on mitigation measures and appropriate monitoring plans was reasonable and consistent with NEPA's requirements.

5.      Evaluation of Significance

As a corollary to their argument concerning the Army Corps' improper reliance on mitigation measures in evaluating the significance of the environmental impacts associated with the Athens Generating project, plaintiffs contend that the EA failed to address two factors - "context" and "intensity" - as required by NEPA.  Specifically, plaintiffs assert that the Army

---

the Army Corps a plan for monitoring and reporting any visible plumes that may occur from the exhaust stacks.  Such plan was to include a schedule for reporting, visual assessments of seasonal plume visibility, criteria for establishing adverse visual impacts, and appropriate options for mitigation of impacts.  The MOA also required Athens Generating to prepare an "Unanticipated Discovery Plan" in the event that cultural or archaeological resources were discovered during construction of the plant.

Corps failed to consider "unique characteristics" of "the Hudson River Valley, its natural setting, its variegated flora and fauna and its cultural and historical background." To the contrary, the record soundly contradicts this assertion. It would be apparent to any rational trier of fact that the MFR did critically analyze these very factors. *See e.g.*, MFR pp.1-2, 104-106, GA 0007-08, 0110-12, *see also* discussion at Section C (2) (a) *infra*. Plaintiffs' contention that the absence of independent studies concerning the efficacy of proposed mitigation measures is evidence of the Army Corps failure to adequately analyze the intensity of the project as required by NEPA has already been addressed by the Court *infra* in Section C (4).

6.      Consideration of Alternative Proposals

        Plaintiffs contend that the Army Corps failed on its own to conduct any meaningful analysis of alternatives to the proposed project including the "no action" alternative. To wit, plaintiffs argue that the Army Corps relied impermissibly on the alternative sites analyses completed by the Siting Board during the Article X process. In support of their argument, plaintiffs cite *Greene County Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412, 420 (2d Cir.) *cert. denied,* 409 U.S. 849 (1972), which holds that an agency has a "primary and nondelegable" responsibility to "consider environmental values 'at every distinctive and comprehensive stage'" of a NEPA review. *Id.* (citation omitted). Specifically, plaintiffs assert that the Army Corps allowed Athens Generating to determine the scope and range of alternatives considered, and relied almost entirely on the analysis conducted by Athens Generating of each of these alternatives. Furthermore, plaintiffs contend that the Army Corps gave no consideration to alternatives made feasible by the switch from hybrid to dry cooling, such as "brownfield" sites or sites with access to a cooling pond.

39

Under NEPA, the range of alternatives which an agency is required to consider is within its discretion.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 551-52 (1978).  Where an agency determines as a threshold matter that an EIS is not required under NEPA, the scope of practicable alternatives analysis is narrowed considerably but ultimately governed by the "rule of reason" given the scope and purpose of the project under consideration.  *See City of New York v. United States Dep't of Transp.,* 715 F.2d 732, 742-43 (2d Cir. 1983).  In addition CEQ regulations specifically require federal agencies to "cooperate with" state agencies to "reduce duplication between NEPA and State" requirements. 40 C.F.R. § 1506.2(b).

Review of the EA reveals that plaintiffs have misstated the record concerning the independent alternatives analysis conducted by the Army Corps.  In sharp contrast to plaintiffs' allegations, the Army Corps did not simply adopt and circulate the determination of the Siting Board regarding appropriate alternatives to the proposed Athens Generating facility.  Rather, the record reveals that the Army Corps reviewed the administrative record of the Article X proceedings and then undertook an independent, measured analysis of possible alternatives to the project in full compliance with NEPA.  *See* MFR pp. 17-24, 98-104, GA 0023-30, 0104-10, *see also* correspondence from Army Corps to Athens Generating, dated Aug. 14, 2000, requesting additional information on "Off-Site Alternatives," GA 0438-40.

The Army Corps summarized its analysis of the alternatives proposed by Athens Generating as follows:

> [In its application] Athens Generating identified and evaluated 6 [alternative] sites in Athens that met the initial screening criteria. As requested by [the Army Corps], the applicant also re-evaluated the five sites identified during the Article X process as well as six sites in the Town of Greenport, for a total of 17 sites.

40

MFR, p. 100, GA 0106.  However, only three of these sites were located in proximity to electric and gas transmission pipelines necessary to operate the proposed generating facility. *See* MFR. pp. 100-01, GA 0106-07.  That none of the preferred "brownfield" sites identified by plaintiffs fit the siting criteria for the project is not the fault of either Athens Generating or the Army Corps.

The Army Corps also expressly noted that while the switch to dry cooling technology had significantly reduced the water requirements for the project, a large surface water source was still necessary.  *See* MFR, pp. 101-02, GA 0107-08.  Evidence of the water intake requirements of the project set forth in the permit application demonstrate that the hypothetical "cooling pond" alternative proposed by plaintiff would be unsuitable for operation of the plant. After stating the comparative limitations and complications of the three areas that met the siting criteria for the project, the Army Corps concluded that the Athens site remained the only practicable alternative that met the project purpose. *See* MFR, pp. 103-04, GA 0109-10.

Based thereupon, the analysis of the Army Corps in this case is wholly distinguishable from the agency action criticized by the Second Circuit in *Greene County.*  Moreover, contrary to plaintiffs' arguments, *Greene County,* does not stand for the proposition that a reviewing federal agency can never consider or incorporate the findings of a state agency when reviewing a proposed project under NEPA.  Indeed, as referenced above, cooperation between state and federal governments is encouraged under NEPA in order to avoid duplication of efforts.[29]  In *Greene County,* however, the Federal Power Commission impermissibly

---

[29]

40 C.F.R. § 1506.2, entitled "Elimination of duplication with State and local procedures," "demonstrates an intent to encourage cooperation," between agencies and "the [Army] Corps' use of, and even to some extent reliance upon, the State DEC findings does not violate NEPA requirements."  *Sierra Club v. Alexander,* 484 F. Supp. 455, 467 (N.D.N.Y. 1980), *aff'd* 633

**substituted** its own assessment of the expected environmental impacts of a proposed project for that of the Power Authority of the State of New York, an agency which also happened to be the permit applicant for the project under review.  *See* 455 F.2d at 420.  Here, the Army Corps properly considered the comments of both the applicant and the Siting Board which was reviewing the applicant's proposal, in addition to conducting its owned careful analysis, concerning the feasibility of alternative sites, all in full compliance with NEPA.

7.      Analysis of Cumulative Impacts

        When an EA concludes with a FONSI, an agency is required to present briefly why an action will not have a significant impact on the human environment. 40 C.F.R. § 1508.13. Critical to impact analysis is consideration of a project's "scope," which may include the following "range of actions:"

> (1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:
>                     . . .
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.
>
> (2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.
>
> (3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement. . . .

F.2d 206 (2d Cir. 1980).

42

40 C.F.R. § 1508.25.  Although the impact of a particular project may be inconsequential when considered in isolation, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27.

Insofar as addressing the broad environmental impacts of the proposed project, the MFR discussed the potential cumulative effect of noise from the new facility and an adjacent compressor station operated by the Iroquois Pipeline Company. *See* MFR p. 93, GA 0099. The EA also addressed the cumulative impact on mortality and migratory patterns for Hudson River fish populations resulting from construction of an additional industrial facility on a waterfront already littered with existing industrial facilities. *See* MFR p. 29, GA 0035.  In connection with this issue, the Army Corps agreed with the assessment of the Siting Board and DEC, that if the proposed dry cooling facility operated as efficiently as expected and ultimately displaced usage at existing, more environmentally degrading Hudson River power plants, this would have a beneficial cumulative impact on fish mortality. *See* MFR pp.27-28, 30, GA 0033-34, 0036.

The Army Corps found that the proposed project would not have any adverse cumulative effect on wetlands given the requirement that post-construction, Athens Generating create 1.6 acres and enhance an additional 3.4 acres of wetlands to compensate for the permanent loss of less than one acre of existing wetlands contemplated during construction of the project. *See* MFR, pp. 36-37, GA 0042-43.  The MFR also addressed the cumulative impact on air quality and emissions expected from construction and operation of the new facility and determined they would not be significant. *See* MFR p. 61, GA 0067.  Finally, the Army Corps incorporated into the MFR the analysis of EPA concerning cumulative pollutant

43

effects from the project, specifically that pre-existing contaminated sediments on the Hudson River bottom would not be eroded or re-suspended by discharge from the new energy facility. *See* MFR, pp. 68-81, GA 0074-87.

Thus the administrative record reveals that the Army Corps did conduct analysis of the cumulative impacts of the proposed project on existing conditions in the vicinity of the Athens project in full compliance with NEPA.  Plaintiffs contend, however, that the Army Corps erred in failing to consider the cumulative impact of future industrial projects planned for the Hudson River Valley area as required by NEPA regulations.  According to plaintiffs, by the time it issued a permit to Athens Generating, the Army Corps  knew that the St. Lawrence Cement Company was planning to construct a large coal burning cement plant directly across the Hudson River from the proposed generating facility.  The only reference to a proposed St. Lawrence Cement plant in the administrative record appears in the permit application submitted by Athens Generating to the Army Corps.  In a portion of the application addressing alternative sites for the proposed project, Athens Generating avers that the alternative sites were "first identified as possible alternative sites for the Iroquois Gas Compressor Station in 1996.  The St. Lawrence Cement Company is proposing a multi-million dollar expansion to its facility, which would effect [sic] the availability of several of the sites."  GA 0544.

There is no other evidence in the administrative record which demonstrates what information or involvement, if any, the Army Corps had concerning the alleged St. Lawrence Cement expansion project at the time it issued the FONSI and permit to Athens Generating. The Army Corps has submitted no supplemental evidence on this issue, but does state in a reply brief in support of summary judgment that it received a permit application from St. Lawrence Cement in January 2001, four months before issuing the FONSI.  However, the

Army Corps contends that it considered the January 2001 St. Lawrence application to be "incomplete" since it "failed to identify all proposed impacts to waters of the United States associated with the project." The Army Corps contends that more than one year after it issued the EA and FONSI in this case, St. Lawrence submitted a subsequent permit application which was also deemed incomplete. According to the Army Corps, NEPA did not require the agency to consider the cumulative impact of an incomplete or speculative proposal such as the St. Lawrence Cement plant at the time it issued a permit to Athens Generating.[30]

Plaintiffs do not contend, nor does the Court find, that the St. Lawrence Cement project, as described by the parties, was a "related" or "similar" action under 40 C.F.R. § 1508.25, which required consideration by the Army Corps. The only question is whether it was a "cumulative action" within the meaning of CEQ regulations. In *Kleppe*, the Supreme Court stated "when several proposals for [ ] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." 427 U.S. at 410. The Court noted however:

> [NEPA] speaks solely in terms of proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated action later reach the stage of actual proposals, impact statements on them will take into

---

[30] The Court hereby takes judicial notice of the fact that the expansion project was abandoned by St. Lawrence Cement after the company received an adverse determination from DOS-DCR in April 2005, that the proposed cement plant was "inconsistent with the state's [CMP]." *See* Thomas Adcock, *David Slays Goliath*, NEW YORK LAW JOURNAL, May 6, 2005. This fact, does not, however, fully resolve the question of what, if any, consideration was due the St. Lawrence proposal by the Army Corps in issuing a permit to Athens Generating in May 2001.

> account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

*Id.* at 410 n. 20.  "Proposals" are expressly defined in the regulations, however, as projects or applications which are sufficiently definite and awaiting agency action, not those which are simply contemplated or advanced by an applicant:

> "Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.

40 C.F.R. § 1508.23.

The administrative record in this case is devoid of evidence that at the time the Army Corps issued a FONSI for the proposed Athens energy facility, there were any other "proposals," as that term is defined under CEQ regulations, pending before the Army Corps which the agency failed to consider in its cumulative impact analysis.  While the Army Corps concedes that it received a permit application from St. Lawrence Cement in January 2001, plaintiffs do not argue, nor can they, that the application was complete, that NEPA review of the project had begun or that Army Corps was poised to make a decision on the cement company's permit application at any time before issuing the requested permit to Athens Generating.

Indeed, there is no evidence in the record concerning the nature, location or scope of work St. Lawrence proposed to conduct in waters of the United States.  Plaintiffs' cursory arguments do not raise material questions concerning whether CEQ regulations required consideration of what plaintiffs contend are "cumulative impacts" of the St. Lawrence project. First of all, the regulatory requirements inescapably provide that "cumulative actions" involve

review of two or more "proposals" as that term is uniquely defined.  *See* 40 C.F.R. § 1508.23.

Even accepting the truth of plaintiffs' allegations, the mere receipt of a permit application

from St. Lawrence Cement by the Army Corps does not meet the definition of a "proposal"

upon which the Army Corps was "actively preparing to make a decision."  *Id.*  Secondly, "the

determination of when cumulative impacts should be considered . . . requires the weighing of

several factors, including the degree of interrelationship between the proposed actions and the

practical feasibility.  *See Kleppe*, 427 U.S. at 412.  "Resolving these issues requires a high

level of technical expertise and is properly left to the informed discretion of the responsible

federal agencies.  Absent a showing of arbitrary action, [a court] must assume that the

agencies have exercised this discretion appropriately."  *Id.*  Based thereupon, in the absence of

evidence that the Army Corps had received from St. Lawrence a "concrete development

proposal [which] crystallize[d] the dimensions of a project's environmental consequences,"

*State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982), the Court finds no basis to

conclude that the Army Corps failed to conduct cumulative impact analysis as required under

40 C.F.R. § 1508.25.

   The only evidence which provides any inkling as to the nature or scope of the planned

cement plant expansion project is contained in unauthenticated copies of seven letters dated

March 1999 to May 2001, between St. Lawrence Cement and DOS-DCR, which are attached

to the affidavit of plaintiffs' attorney.  Plaintiffs contend that these letters, which describe in

some detail the proposed cement plant, are evidence of the Army Corps' knowledge of and

involvement in permitting for the project since the letters were copied to the Army Corps.

Additionally, plaintiffs rely on an extra-record affidavit submitted by Laura Skutch, Director

of Citizens for the Hudson Valley, in which Ms. Skutch avers that she "obtained" five of the

afore-referenced letters from DOS-DCR.  Ms. Skutch also states that in a conversation with

Christine Delorier, of the Army Corps, "six to eight months" prior to June 2001, Ms. Delorier

told her that upon completion of the Athens project review, she "needed to immediately start

the St. Lawrence Cement review as she had been appointed the principal agent responsible for

reviewing that project as well."

       As referenced above, plaintiffs do not address the application of the "record rule" to

the inquiry at bar.  In support of their extra-record submissions, plaintiffs notably do not

contend that the administrative record is incomplete on the issue of failure to consider

cumulative impacts as required by NEPA.  Instead, plaintiffs contend that the Court should

conduct plenary review of matters outside the administrative record pursuant to the public

record exception to the hearsay rule in Fed. R. Evid. 803(8).  Even if the Court were to deem

the administrative record deficient on the issue of cumulative impact analysis and consider the

plenary evidence submitted by plaintiffs, the St. Lawrence Cement project was too

"speculative and contingent" in May 2001 to have required cumulative analysis under 40

C.F.R. § 1508.25.  *Vill. of Grand View v. Skinner*, 947 F.2d 651, 659 (2d Cir. 1991).

       Review of the letters between St. Lawrence Cement and DOS-DCR demonstrates that

far from being "imminent or inevitable," *Skinner*, 947 F.2d at 659, St. Lawrence Cement was

in the preliminary stages of obtaining required permits and approvals for its proposed

expansion in May 2001.  The documents show that St. Lawrence Cement had submitted a

"joint water permit application" to DEC and the Army Corps, and a draft environmental

impact statement ("DEIS") to DEC concerning the project as of January 2001.  However, the

correspondence from DOS-DCR clearly indicates that no permits could be issued by DEC for

the project unless and until DOS-DCR "made a written finding that the action is consistent

with [state] coastal policies" pursuant to 19 N.Y.C.R.R. Part 600.5.[31]  Further, the letters from

DOS-DCR stated that no federal permits or licenses could be issued unless the requested

activity was consistent with the state's CMP.

Clearly then, the granting or denial of permits by DEC and the Army Corps in the case

of St. Lawrence Cement was wholly contingent upon a preliminary determination by DOS-

DCR that the project was consistent with the state's CMP.  Thus plaintiffs mistakenly rely on

the pendency of permit applications by St. Lawrence Cement, complete or not, with state and

federal agencies as proof of the Army Corps' obligation to conduct cumulative impact analysis

under NEPA.  Further, even assuming the truth of Laura Skutch's vague allegations, they are

not dispositive of the Army Corps' compliance with NEPA.  Even if Ms. Delorier believed

that the Army Corps would commence review of the St. Lawrence Cement project

"immediately" after completing its NEPA analysis of the Athens Generating permit

application, the agency had no authority to issue a permit until after DOS-DCR conducted its

CMP consistency review.

Indeed, it was not until February 2, 2001, that St. Lawrence Cement forwarded

sufficient documentation to DOS-DCR to **commence** that agency's review of St. Lawrence

Cement's request for a determination that the project met the requirements of the state's CMP.

As of May 15, 2001, two weeks before the Army Corps issued its FONSI in connection with

the Athens Generating Project, DOS-DCR advised St. Lawrence that the agency "[could] not

---

[31] 19 N.Y.C.R.R. Part 600 *et seq.* sets forth the state's policies with respect to waterfront
revitalization and coastal resources.  The regulations were enacted pursuant to New York
Executive Law § 913 which gave the New York Secretary of State the power to "review,
evaluate and issue recommendations and opinions" concerning actions of state agencies such
as DEC which may have the potential to affect coastal resources.  N.Y. Exec. Law § 913 (4).

complete its consistency review" until it coordinated with the involved federal, state and local agencies. Thus, it was not at all certain when the Army Corps issued its permit to Athens Generating that the proposed cement expansion project would ever be completed. Surely it would have been "impracticable" in or before May 2001, for the Army Corps to have coordinated its review of the Athens Generating project with an incomplete permit application for possible future construction of a cement plant when the agency could not even consider granting a permit until DOS-DCR issued a consistency determination. *See Skinner*, 947 F.2d at 659-60. The Court finds that even upon consideration of the extra-record evidence submitted by plaintiffs, they have failed to show that when the Army Corps issued its EA and FONSI concerning the Athens Generating permit in May 2001, the St. Lawrence Cement project had reached the "proposal" stage whereby the Army Corps could meaningfully evaluate its impact. *See* 40 C.F.R. § 1508.23.

8.    Release of Draft EA and FONSI to Public

Plaintiffs' final claim of a procedural violation of NEPA alleges that the Army Corps violated the statute's regulations by failing to make its EA and MFR available for public review and/or comment prior to issuance of the documents. The Second Circuit has already considered this issue and determined that while such pre-filing disclosure and public involvement is required prior to an agency's issuance of an EIS or EA in "certain limited circumstances" involving actions which "normally require[] the preparation of an [EIS]," 40 C.F.R. § 1501.4 (e)(2)(i), the permit decision by the Army Corps herein was not likely to fall into this category. *See Pogliani II*, 360 F.3d at 1238-40. Upon conducting a comprehensive review of the entire administrative record and plaintiffs having submitted no additional evidence demonstrating that the pre-filing requirement was triggered, the Court concurs with

50

the assessment of the Second Circuit on this issue.

D.    Plaintiffs' Substantive NEPA Claim

Turning to plaintiffs' substantive NEPA claim - that the Army Corps' conclusion that no EIS was required in this case was erroneous - the determination of "no significant impact" is "neither a rulemaking nor an adjudicatory function of the Army Corps, but rather a factual finding made by an agency with particular expertise in environmental matters." *Gorsuch*, 718 F.2d at 35.   The appropriate scope of review is therefore prescribed by the Administrative Procedure Act ("APA"), which provides that agency action may be overruled by a court only if the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Overton Park,* 401 U.S. at 414.   In *Vermont Yankee*, a case which illustrates the limited role of reviewing courts under the APA, the Supreme Court held that while NEPA established "significant substantive goals for the Nation," it imposed upon agencies duties that are "essentially procedural."   435 U.S. at 558. To wit, NEPA was enacted  "to insure a fully informed and well-considered decision," but not necessarily "a decision the judges of the Court of Appeals or [the Supreme] Court would have reached had they been members of the decisionmaking unit of the agency." *Id*.  "[O]nce an agency has made a decision subject to NEPA's procedural  requirements, the only role for a court is to insure that the agency has considered the environmental consequences." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980).  In one of the earliest decisions to analyze the role of courts in reviewing NEPA claims, the District of Columbia Circuit stated:

> In this as in other areas, the functions of courts and agencies,
> rightly understood, are not in opposition but in collaboration,
> toward achievement of the end prescribed by Congress.  So long as

51

the officials and agencies have taken the "hard look" at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken.

*Nat. Res. Defense Council v. Morton*, 458 F2d 827, 838 (D.C. Cir. 1972); *see also Kleppe*, 427 U.S. at 410 n. 21 (adopting "hard look" standard); *Sierra Club I*, 701 F.2d at 1029-30 (same).

In light of the ample administrative record which details extensive review of the Athens Generating project by numerous state and federal agencies and the expansive MFR and EA prepared by the Army Corps, this Court cannot conclude that the agency abused its discretion in declining to prepare an EIS.  The EA demonstrates that the Army Corps carefully considered the effects of the Athens project on the aesthetic value of Hudson River Valley and its environs, the cultural and historical significance of the site, the impact to wildlife, water and air quality and all feared detrimental impacts to the quality of the human environment in the vicinity of the project.  It cannot be said that the Army Corps ignored the local importance of the scenic value of the Hudson River Valley or the existence of opposition to the project. The Army Corps specifically addressed these concerns in the EA, the MOA and the special conditions which accompanied its grant of a permit to Athens Generating.  Indeed, the entire thrust of requiring special conditions and mitigation measures was to preserve the integrity of the historic viewsheds in the Hudson River Valley while at the same time balancing legitimate electrical generating needs. *See Swinomish Tribal Comty. v. Fed. Energy Reg. Comm.*, 627 F.2d 499, 512 (D.C. Cir. 1980) (noting that Commission's requirement of extensive mitigation measures aimed at minimizing the aesthetic impacts of the project demonstrated that it seriously considered those impacts); *see also Hanly II*, 471 F.2d at 832 (affirming agency decision that mitigation measures would minimize aesthetic impact of project).

Based thereupon, the Court finds plaintiffs have failed to raise a material question of fact concerning whether the Army Corps violated any of NEPA's substantive or procedural requirements in issuing a FONSI and permit to Athens Generating in this case.

E.      Liability on NHPA Claim

In their opposition papers, plaintiffs appear to have abandoned their claim that the Army Corps' violated NHPA when it failed to analyze the impact of the proposed project on cultural and historical resources in a "reasonable" and "good faith" manner as required by the statute and its implementing regulations.  36 C.F.R. § 800.4(b).  In any event, the Army Corps conducted the required review under § 106 of NHPA to identify adverse effects to historic properties and cultural resources from the proposed action and prevent or mitigate those effects.  The Court finds that the MOA, which was ultimately executed by the Army Corps, SHPO, ACHP and all other interested parties upon completion of the §106 review, is persuasive evidence that the Army Corps fulfilled its obligations under NHPA.  By failing to even address the issue in their opposition papers, plaintiffs have failed to raise material doubt concerning the correctness of this conclusion.

IV.    **CONCLUSION**

It is notable that while the Athens Generating plant became operational in 2004, in the midst of litigation here and at the Second Circuit, the Court has received no indication, either by way of correspondence or requests to supplement the evidentiary record, that any one of the litany of environmental or aesthetic catastrophes envisioned by plaintiffs has occurred.  The Court concludes that the explanation for this conspicuous absence of additional evidence lies in the validity of the Army Corps' well-founded estimation that construction and operation of a state-of-the-art, gas-fired, dry-cooled electric generation facility designed expressly to

eliminate or minimize impacts to the environment in the historically industrialized Hudson

River Valley with the recommended mitigation measures would not cause significant

environmental impacts or "constitute a significant deviation" from the site's then existing

conditions.  MFR, p. 105, GA 0111.

In view of the foregoing, defendant's motion for summary judgment is hereby

GRANTED; and it is further

ORDERED that plaintiffs' complaint is hereby dismissed with prejudice in its entirety.

IT IS SO ORDERED.

Dated: March 28, 2007
       Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge